# EXHIBIT 1

1997 Contract

(Pages 4-5 and 7-8 missing)

May 1, 1997 through April 30, 2000

AGREEMENT

Between

MICHIGAN REGIONAL COUNCIL
OF CARPENTERS
TRAVERSE CITY/ALPENA,
LOCAL 202

of the

UNITED BROTHERHOOD
OF CARPENTERS
AND JOINERS OF AMERICA

and

MICHIGAN CHAPTER
ASSOCIATED GENERAL CONTRACTORS
OF AMERICA, INC.

LABOR RELATIONS DIVISION

# INDEX

| Description | Page | Article |
|---|---|---|
| Apprentices | 7 | Article X |
| Carpenter Wages | 7 | Article IX |
| Compensation Insurance | 10 | Article XV |
| Craft Jurisdiction | 16 | |
| Disaster Relief | 4 | Article VI |
| Discharge or Layoff | 8 | Article XII |
| Employment | 3 | Article III |
| Equal Employment Opportunity | 4 | Article IV |
| Equal Treatment | 4 | Article V |
| Foreman | 8 | Article XIII |
| Fringe Benefits Fund | 8 | Article XIV |
| Geographical Jurisdiction | 2 | Article I |
| Grievance Procedure | 12 | Article XXI |
| Hours | 5 | Article VIII |
| Intent and Purpose | 2 | Article II |
| Invalidity | 14 | Article XXIII |
| Jurisdiction Procedure | 12 | Article XX |
| Market Recovery | 15 | Article XXIV |
| Michigan State Consent Agreement | 22 | |
| Non-Signatory Agreement | 20 | |
| Pay Day | 7 | Article XI |
| Piledriving | 13 | Article XXII |
| Representative/Organizer | 11 | Article XVII |
| Safety | 12 | Article XIX |
| Stewards | 11 | Article XVI |
| Subcontracting | 4 | Article VII |
| Supplemental Residential Agreement | 15 | |
| Termination & Signatures | 16 | Article XXV |
| Working Conditions | 11 | Article XVIII |

1

# AGREEMENT

This Agreement, made and entered into by and between the Michigan Chapter, Associated General Contractors of America, Inc., Labor Relations Division of, hereinafter referred to as the "Association", for and on behalf of its members and other non-member Employers who may become signatory, hereinafter referred to as "Employer" or "Employers" and the United Brotherhood of Carpenters and Joiners of America, AFL–CIO, Michigan Region Council of Carpenters, hereinafter referred to as the "Union" or "Employees". The terms of this Agreement shall continue in full force and effect from May 1, 1997 through April 30, 2000.

It is understood that the Association is acting only as an agent in the negotiation of this Agreement, and it is agent only for those individuals, partnerships and corporations who have authorized it so to act and in no event shall it be bound as principal or be held liable in any manner for any breach of the Agreement by any of the Employers for whom it is acting, or by any employee of such Employers.

It is further agreed and understood that the liabilities of the Employers who have authorized the negotiation and execution of the Agreement shall be several and not joint.

## ARTICLE I
## Geographical Jurisdiction

This Agreement shall include the following Counties:

Alcona, Alpena, Antrim, Benzie, Charlevoix, Cheboygan, Crawford, Emmet, Grand Traverse, Kalkaska, Leelanau, Manistee, Missaukee, Montmorency, Oscoda, Otsego, Roscommon, Presque Isle and Wexford.

## ARTICLE II
## Intent and Purpose

**Section 1. Intention.** It is the intent and purpose of the parties hereto that this Agreement will promote and improve industrial and economic relationships between the Employer and the Union in the construction industry for the jurisdiction of the Union, to set forth herein the basic Agreement covering the rates of pay, hours of work, and conditions of employment to be observed between the parties hereto.

This Agreement shall apply to all building construction work recognized as commercial, industrial or institutional coming under the jurisdiction of the United Brotherhood of Carpenters and Joiners of America by determination of the National Joint Board for the settlement of jurisdictional disputes.

This Agreement shall not apply to highway and bridge construction work as awarded by any Governmental Authority.

This Agreement covers construction which is herein defined as all work in connection with; construction, alteration or repair of all residential units such as single dwellings, duplexes, row houses, town houses and walk up apartments and related buildings.

2

The Agreement shall apply to all Pile-Driving operations.

The Agreement covers the entire understanding between the parties hereto. No oral or written rule, regulation or understanding which is not set forth herein will be of any force or effect upon the parties hereto.

The parties hereto are desirous of preventing strikes and lockouts and facilitating peaceful adjustments of grievances and disputes between the Employer and the employee.

**Section 2. Employer Representation.** The Union recognizes the Association as sole and exclusive Employer representation for its members for the purpose of collective bargaining within the geographical area coming within the jurisdiction of this Agreement. It is agreed the Union shall file with the Association a list of all Employers with whom the Union has Agreements who perform the same type of work, if requested.

**Section 3. Employee Representation.** Each Association (or Employer) hereby recognizes the Union as sole and exclusive employee representative for the purpose of collective bargaining for all of its employees performing work covered under the terms of the Agreement within the jurisdiction of the Union, who are members of any Local Union affiliated with the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, and also of such other employees recognized by law as part of the appropriate collective bargaining unit.

**Section 4.** Employers from other areas who come into the territorial jurisdiction of the Michigan Regional Council of Carpenters to perform work can bring up to two (2) employees, excluding non-working supervision above general foreman, to work in the area covered by this Agreement.

# ARTICLE III
# Employment

**Section 1. Union Security.** The Union shall be given opportunity to furnish competent workmen, upon notification to the Union of the number of employees needed upon forty-eight (48) hours notice from the Employer or his representative. The Employers agree that in the employment of workmen to perform the various classifications of labor required in the work under this Agreement, they will not discriminate against applicants because of membership or non-membership in the Union. The Union in its referral of applicants to the Employers agrees that it will not discriminate against said applicants because of membership or non-membership in the Union. Each employee shall, as a condition of employment, thereafter, become and remain a member of the Union in good standing by tendering his initiation fee and periodic dues for the term of his employment on and after the seventh (7th) calendar day beginning with the first (1st) day of his employment by any Employer or Employers covered by this Agreement, whichever is the later. Membership in the Union shall be available to each employee on the same conditions which govern membership for other employees.

**Section 2. Employer Security.** The Union further agrees that it will not require the Employers or any Employer to take any action which

3

bricklayers, cement finishers, operators and rod busters) working for the same employer at the Carpenters must also work under the "4-10's".

Section 4. Overtime and Holidays. Time and one-half (1½) shall be paid for all hours worked before and after the regular working hours on any regular work day and for all time worked on Saturdays. Double (2) time shall be paid for all hours worked on Sundays, New Year's Day, Decoration Day, Fourth of July, Labor Day, Thanksgiving and Christmas. No work shall be performed on Labor Day, except to save life or property. When any of the above Holidays fall on a Sunday the following day shall be observed as the Holiday. Overtime work shall be distributed to the employees as equally as possible without discrimination.

Section 5. Reporting Time. Any employee reporting for work at the regular starting time, and for whom no work is provided shall receive pay for two (2) hours for so reporting, unless he has been notified not to report before leaving the end of his previous shift, or unless prevented from working for reasons beyond the control of the Employer, including inclement weather or breakdown. If an employee stops work of his own accord, he shall be paid only for actual hours worked.

Section 6. Shift Work. Shift work is defined as one crew following another, but not working simultaneously, except for odd shift.

(a) Odd Shift: An odd shift shall be permitted to accommodate job and site conditions. There shall be premium of fifty (50¢) cents per hour in addition to the regular hourly rate of pay.

(b) Regular Shift: When multiple shifts are worked, the second shift shall work seven and one-half (7½) hours and be paid for eight (8) hours, and the third (3rd) shift shall work seven (7) hours and be paid for eight (8) hours. There shall be a premium of fifteen (15¢) cents per hour in addition to the regular hourly rate of pay. Time and one-half (1½) shall be paid for all work performed in excess of the above stated hours Monday through Friday and for Saturday. Double (2) time shall be paid for Sundays and Holidays.

(c) Employees shall not be allowed to work more than one (1) shift in any twenty-four (24) hour period without the permission of the Union.

**Section 4. Fringe Adjustments.** If the Michigan Regional Carpenter's Council and the Michigan Chapter, Associated General Contractors of America, Inc., Labor Relations Division, agree to a change in the Employer contributions to the above-named funds, the employee's hourly rate shall be adjusted accordingly.

**Section 5. Construction Industry Advancement Program.** Each Employer covered by this Agreement shall pay to the Construction Industry Advancement Program eight (8¢) cents per hour paid by the Employer to his employees within the bargaining unit. Payments shall be made with such instruction and such forms as are furnished by the Trustees.

It is agreed by the Employer that the Construction Industry Advancement Program shall not be used for lobbying in support of anti-labor legislation of any kind at municipal, state, or national levels, or to subsidize any Contractor or Contractor Association in connection with any work stoppage or strike, nor shall it be used to support any anti-union activity.

The program shall comply with all present and future Federal Laws governing the same.

The Union shall have no participation or control of any kind or degree whatever, nor shall the Union be connected in an way with the Construction Industry Advancement Program.

**Section 6. Dues Deduction.** The Employer appoints the Contract Administrator Fringe Benefits Program as its agent for the receipt of dues deduction authorizations. Receipt of a written authorization by the Administrator shall constitute receipt by each Employer.

The Employer shall deduct as working dues from the wages of each employee who has individually and voluntarily authorized such deduction in writing, an amount certified by the Union on an annual basis to be the working dues uniformly required. Any such authorization by any employee shall contain a provision as required by law, for revocation.

The Union will hold the Employers harmless and indemnify them for any loss suffered as a result of the Union dues deduction.

**Section 7. Violation of Payments.** The Employer agrees to pay all costs of collection charges resulting from late payments of delinquent contributions and further agrees to abide by the rules and regulations promulgated by the Trustees of said Funds.

If the Employer fails to make fringe benefit contributions in accordance with this Agreement, the Union may take economic action against the employer provided it gives written or telegraphic notice forty-eight (48) hours, excluding Saturday, Sunday or holidays, to said Employers and the Association before taking such action.

The deposits will be accompanied by such reports as may be designated by the Trustees of the Funds in accordance with the terms of the Agreement of the Trust which is incorporated hereby referenced. The deposits will be sent to such depository as may be designated by the Trustees.

**Section 8. Fringe Benefits Security.** Employers who do not have an established satisfactory record of payments into the Fringe Benefit Funds and Employers who become delinquent in the monthly record of

9

Health Care, Pension, and/or Apprenticeship payments as determined by the Fund Administrator shall be required to post a certified check in the amount of $500.00 per employee covered under the terms and conditions of this Agreement. The check shall be payable to the Trustees to guarantee payment of said enumerated Fringe Benefit Funds that are due in accordance with the terms of this Agreement.

Upon receipt from the Fund Administrator's office of the monthly eligibility reports that such employer is delinquent in contributions required as set forth in this Agreement, the Fund Administrator shall deduct the delinquency and appropriate penalties from the certified check security to apply on said delinquencies.

If after payment of said delinquency there is a balance remaining, said cash balance shall be left on deposit with the Fund Administrator and the Employer shall be required to give an additional certified check or cash to bring the security back to the original amount. Upon request of the Union, individual Employers will furnish proof of their compliance with the provisions of this Article.

The amount deposited is to be held by the Fund Administrator until:

1. Completion of twelve (12) successive months of operation without delinquency, however, the requirement may be reinstated upon any subsequent delinquency.

2. Termination of this Agreement.

3. Completion of such Employer's project, upon the written clearance from the Funds Administrator's Office that such employer has satisfactorily made necessary contribution payments as required by this Agreement.

If the amounts held as security are to be returned to an Employer in accordance with the foregoing and the Employer cannot be located by the Fund Administrator, any balance remaining after two years shall be forfeited and shall be transferred to and become part of the Joint Apprenticeship Fund, provided that the Joint Apprenticeship Fund shall pay to any such Employer the amount so transferred if, within three years of transfer, a claim is made thereafter by the Employer.

Section 9. Delinquent Contractors. In order to assure compliance by all Employers in making the contributions required by this Article, the Union and the Association will request from the Administrator of the Trust Funds each month a list of Employers who are delinquent in making the required payments. This list will be made available to signatory contractors and to representatives of the Union in order to encourage compliance with the obligations of this Article.

## ARTICLE XV
### Compensation Insurance

Each Employer shall provide protection as required under the provisions of the Worker's Compensation Law of the State of Michigan. He shall also make contributions for his employees under the Michigan Employment Security Act regardless of the number of men employed by him. The Employer agrees to furnish all registration numbers when requested to do so by the Union.

In the event that the Michigan State Legislature during the term of

10

the agreement passes a bill amending the Workers' Compensation Act, to the extent that it becomes permissible to collective bargain language concerning workers' compensation, then the parties to this Agreement will attempt to mutually draft an addendum to this Agreement reflecting their intent insofar as workers' compensation is concerned. In accordance with the parameters spelled out in any such amendment to the Act, within sixty (60) to ninety (90) days after such act has been passed as law.

## ARTICLE XVI
### Stewards

There shall be a working Steward on each job, and it shall be the sole responsibility of the Business Manager for his selection from among the local employees on the job.

The Steward shall be a qualified workman performing the work of the craft. A Steward shall be on the job at all times when carpenters are working, and prior to his layoff, discharge, or transfer, the Employer will notify the Business Manager.

The Steward's activity shall be confined to the area in which work is performed by his Employer. The Steward shall be permitted sufficient time to perform his usual Steward duties with the least interference to the job and it shall be his responsibility to report unsafe working conditions to the Foreman and the Union.

If an employee becomes sick or injured during the course of his employment, the Steward shall be notified immediately in order that he might properly take care of personal property of said employee and notify his family, if necessary.

The Steward shall be one of the last two employees to be laid off the job when the job is finishing up, providing he is capable of performing the work required.

If a job is shut down for any reason, the Steward will be the first to be recalled when the job resumes, if available.

## ARTICLE XVII
### Representative/Organizer

The Representative/Organizer shall be permitted on all jobs, but shall not unduly interfere with the employees during working hours. He shall report his presence to the Employer or his Representative, if available.

## ARTICLE XVIII
### Working Conditions

Section 1. Shelter. The Employer shall provide a suitable shelter capable of being locked for storage of tools and clothing. If the Employer fails to provide such storage space for tools and clothing, and any loss occurs, then the Employer is to be held responsible for lost tools and clothing, which shall be replaced or reimbursement made by Employer within 15 days.

11

**Section 2. Drinking Water.** The Employer shall furnish sanitary drinking water in enclosed carriers and shall provide individual cups.

**Section 3. Sanitary Facilities.** The Employer shall furnish and maintain proper sanitary facilities for the employees. Such facilities shall be properly disinfected at least three times a week.

## ARTICLE XIX
### Safety

Each employee shall, as a condition of employment, wear proper shoes and wear a safety helmet when required by the Employer.

The Employer and the employees shall comply with all the rules and laws pertaining to safety and sanitation as established by the Federal and State Governments. Safety devices provided by the Employer shall not be removed by the employees, and where individual safety devices are furnished by the Employer to be worn by the employees, they shall be worn; and the Union will cooperate with the Employers to see that these provisions are enforced.

If an Employee becomes injured or suffers a job related illness and is unable to return to work, such Employee will be paid at the regular rate of pay for all time lost that regular day as a direct result of said illness or injury.

## ARTICLE XX
### Jurisdiction Procedure

In the event of a jurisdictional dispute involving the Union, the parties shall request the other Union or Unions involved to send Representatives to the job site to meet with Representatives of the Union and Employer to settle the dispute. If a settlement is not reached at that meeting, the Union shall request that its International Union assign a Representative who shall make arrangements to meet Representatives of the other International Union or Unions involved and Representatives of the Employer on the job site to seek settlement of the dispute. The Employer shall also request the International Unions involved to assign Representatives to seek settlement of the dispute.

The Union and the Employer agree that there shall be no strikes, lockouts or interruption of the disputed work over jurisdictional disputes.

## ARTICLE XXI
### Grievance Procedure

In the interest of uninterrupted progress on any and all work covered by this Agreement the parties hereby agree that there shall be no lockout on the part of any Employer, and there shall be no strikes or stoppage of work called by the Union pending investigation of any dispute and attempts to bring about peaceful settlements as provided in this Article.

Should any dispute arise concerning the application or interpretation

of the terms of this Agreement, it shall be first placed in writing within five (5) days of the employees knowledge of the events giving rise to the grievance. The Employer or his Representative and the area Regional Council Union Representative shall meet promptly to resolve the dispute.

If the parties in the local area do not succeed in resolving such dispute or grievance, notice shall be given promptly to the other and upon receipt of such notice, the Employer and the Union shall each immediately designate a representative and notify the other party of the representative's name and address. The representatives appointed shall contact each other and make arrangements for a meeting to be held within ten (10) days or at any mutually agreeable date and place for the purpose of resolving the issues involved.

Disputes involving the application or interpretation of this Agreement which are not resolved between the two Representatives referred to in paragraph two above shall be referred to an impartial third party appointed according to the procedure of the Federal Mediation and Conciliation Service who shall within thirty (30) days, or at any early mutually agreeable date and place, meet to consider the issues involved in the dispute and render a decision. Any decision reached by the Arbitrator shall be final and binding upon all parties for the duration of this Agreement. The Arbitrator shall have no authority to alter, amend, delete or add to any provisions of this Agreement. The time constraints provided herein may be waived by mutual consent of the parties.

## ARTICLE XXII
### Piledriving

All articles of this Agreement are applicable to Piledriving. The following applies exclusively to Piledriving:

Crews: When using a roller rig and skid rig there should be no less than five (5) men and a Foreman to constitute a crew.

On Crane Piledriving rigs there should be no less than three (3) men and a Foreman to constitute a crew except where hazardous and hardship conditions exist. One (1) man or more will be added as needed.

A crew shall consist of two (2) men or more as needed for assembling shells and piles and plastic cement applications.

A crew shall consist of two (2) men or more as needed for the underground cutting of pile.

Carpenters may be used by the Employer on any type of work available on piledriving work covered by this Agreement.

The Employer shall furnish the following equipment as required: Rain gear, rubber boots, goggles and any other wearing apparel required for the safety of the employee.

At the end of the work day, all employees shall be allowed ten (10) minutes to pick up, clean and put away tools.

The Employer shall provide a satisfactory place for quarters and shall provide suitable heat twenty-four (24) hours a day for storing and drying clothes.

13

Foreman: There shall be a Piledriving Foreman on the job where Piledrivers are to be employed. One (1) Foreman shall be allowed to supervise more than one (1) job provided his time and transportation expenses between jobs are paid for by the Employer.

The Piledriver shall take orders from no other than their designated Foreman and no Foreman shall be allowed to work with tools while directing more than five (5) Piledrivers.

Welding: Any employee who does welding on a full-time basis shall receive twenty-five (25) cents per hour in addition to the regular hourly rate stated hereafter.

## PILEDRIVER WAGES

Journeyman Piledriver:

Effective First Full Pay Period on or After:

|  | 5/1/97 | 5/1/98 | 5/1/99 |
|---|---|---|---|
| Base Rate | $17.62 | $18.37 | $19.07 |
| *Dues (3% Deduction) | (.68) | (.71) | (.73) |
| Health Care | 2.30 | 2.30 | 2.30 |
| Pension | 2.60 | 2.60 | 2.60 |
| Apprenticeship | .15 | .15 | .15 |
|  | $22.67 | $23.42 | $24.12 |
| CIPA | .08 | .08 | .08 |
| Total | $22.75 | $23.50 | $24.20 |

*To be deducted from the Base Rate after payroll taxes have been computed and remitted to the Fund Office along with other fringe benefit contributions.

Foreman: The Foreman rate of pay shall be a minimum of one dollar ($1.00) per hour above the Journeyman scale and the balance negotiated between the Employer and Foreman on a project to project basis.

General Foreman: The General Foreman shall negotiate a rate above the Foreman's rate on a project to project basis.

In the event the Employer bids on a public project being awarded by a federal, state, county, city or other public entity in which project specifications post Davis-Bacon or other minimum wage rate determinations, the wage rate so posted shall apply for the duration of the project in lieu of the above wage rates. However, in no case shall the employee receive less than 90% of the above effective wage rate. The fringe benefits applicable to such project shall be the fringe benefits as set forth in this Agreement.

## ARTICLE XXIII
### Invalidity

In the event any portion of this Agreement is declared or becomes inoperative under the State or Federal Laws, the balance of the Agreement shall remain in full force and effect and the parties hereto agree to meet and renegotiate the inoperative portion of the Agreement.

## ARTICLE XXIV
### Market Recovery Program

It is recognized by the parties to this Agreement that the Union construction market has been threatened by non-union competition. Where mutual interest of both the Michigan Chapter AGC Contractors and the Union are served by cooperating to compete more effectively, it is agreed that the Michigan Chapter AGC Contractors and the Union will meet to negotiate a market recovery rate and/or conditions on a job by job or an area by area basis. A market recovery rate negotiated pursuant to this provision shall not be considered a more favorable rate or agreement within the meaning of Article V of this Agreement.

## SUPPLEMENTAL RESIDENTIAL AGREEMENT
### between the
### Michigan Chapter, Associated General
### Contractors of America, Inc.
### Labor Relations Division
### and the
### Michigan Regional Council of Carpenters
### Traverse City/Alpena Local 202

This Agreement covers residential construction which is herein defined as all work in connection with: construction, alteration, or repair of all residential units such as single dwellings, duplexes, row houses, town houses, walk-up apartments, and related buildings. This Agreement does not cover those housing units constructed of reinforced concrete, and/or steel framed units normally referred to as "high-rise" and are normally in excess of four (4) stories in height.

Further, the Employer recognizes the traditional trade jurisdiction in the field of housing of the United Brotherhood and agrees to assign such work only to members of the unit as set forth in this Agreement.

## HOURS

Regular day – regular week – forty (40) hours, consisting of five (5) days of eight (8) hours each, Monday through Friday, shall constitute a regular work week.

Overtime and holidays – all work performed in excess of eight (8) hours per day, Monday through Friday, and all work performed on Saturdays, shall be paid at the rate of time and one-half (1½). Work performed on Sundays and the following holidays shall be paid at double (2) time:

| | |
|---|---|
| New Year's Day | Labor Day |
| Decoration Day | Thanksgiving Day |
| Fourth of July | Christmas Day |

No Employee shall be allowed to work on Labor Day, except to save life or property. Hours may be changed by mutual agreement between the Employer and the Union representative.

Any Employee losing time because of inclement weather may, if requested by the Employer, work (if Employee desires) Saturday for

straight time for the purpose of getting forty (40) straight-time hours in a week.

## WAGES

In the geographic jurisdiction covered by this Collective Bargaining Agreement the rate of pay will be seventy-five percent (75%) of the base rate of the current basic Carpenter Commercial Building and Heavy Construction Agreement and all fringe benefits will be identical to the fringe benefits established throughout the area.

## ARTICLE XXV
### Termination

This Agreement shall continue in effect through **April 30, 2000.** Should either party desire to amend or terminate this Agreement at the above expiration date, such party shall give the other written notice of such desire at least sixty (60) days prior to the expiration date. If neither party gives such notice to amend or terminate the Agreement, it shall remain in full force from year to year hereafter unless sixty (60) days prior to the annual anniversary date notice to be given in writing by either party to the other indicating a desire to amend or terminate on said annual anniversary date.

|  | 4/9/97 |
|---|---|
| Mr. Bob Fontana | Date |

Director of Labor Relations
Michigan Chapter, Associated General Contractors of America, Inc.
Labor Relations Division

|  | 4/11/97 |
|---|---|
| Mr. Walter R. Mabry, Executive Secretary-Treasurer | Date |

Michigan Regional Council of Carpenters
Traverse City/Alpena Local 202
United Brotherhood of Carpenters and Joiners of America

|  | 4/11/97 |
|---|---|
| Mr. David Stark, Regional Director | Date |

Michigan Regional Council of Carpenters
Traverse City/Alpena Local 202
United Brotherhood of Carpenters and Joiners of America

## CRAFT JURISDICTION

**Employee Representation.** The Association recognizes the Union as sole and exclusive Employee representative for the purpose of collective bargaining in the jurisdiction of this Agreement, and within the scope of its jurisdictional claims.

(A) This Agreement covers all Employees performing Carpenter work coming under the work jurisdictional claims of the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, as are more specifically set forth hereinafter in subsection (B) of this Article

16

and by decisions and agreements of record rendered, affecting the Building Industry, by the National Joint Board for the Settlement of Disputes affecting the Building and Construction Trades Department of the AFL-CIO and various Employers in the Building and Construction Industry. The Employer agrees to assign work in accordance to decisions rendered and agreement, of the National Joint Board, and according to the jurisdictional claims of the Union, when they are not found to be in conflict of said decisions.

In the interest of promoting industrial peace and harmony in the Construction Industry, the Association agrees to cooperate in the settlement of jurisdictional disputes. It is agreed that both organizations agree to supply necessary information regarding disputes whenever they arise, if available.

(B) The Employer recognizes the jurisdiction of the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, as to all work that has historically and traditionally been performed by its members and recognizes the trade autonomy of the United Brotherhood, consisting of the milling, fashioning, joining, assembling, erecting, fastening or dismantling of all materials of wood, plastic, metal, fiber, cork or composition, and all other substitute materials. The handling, cleaning, erecting, installing and dismantling of all machinery, equipment and all materials used by members of the United Brotherhood.

The jurisdiction, therefore, extends over the following divisions and sub-divisions of the trade: Carpenters and Joiners, Millwrights, Pile Drivers, Bridge, Dock and Wharf Carpenters, Underpinners, Timbermen, Core-Drillers, Shipwrights, Boat Builders, Ship-Hand, Star-Builders, Millmen, Wood and Resilient Floor Decorators, Floor Finishers, Carpet-Layers, Shinglers, Siders, Insulators, Acoustic and Dry-Wall Applicators, Shorers and House Movers, Loggers, Lumber and Sawmill Workers, Reed and Rattan Workers, Shingle Weavers, Casket and Coffin Makers, Railroad Carpenters and Car Builders, regardless of material used and all those engaged in the operation of woodworking or other machinery required in fashioning, milling, or manufacturing of products used in the trade, and the handling, erecting and installing materials on any of the above divisions or sub-divisions, burning, welding, and rigging incidental to the trade. When the term "Carpenter and Joiner" is used it shall mean all the sub-divisions of the trade.

The trade autonomy of the Employees represented by the Union therefore extends over the division and sub-division of the trade which are set forth as follows:

(1) The erection of steel sections or its equal. The building and setting of all forms and centers for brick and masonry. The fabrication and erection of all forms of concrete and decking, the dismantling of same (as per International Agreement) when they are to be re-used on the job or stored for re-use. The cutting and handling of all falsework for fireproofing and slabs. Where power is used in the setting or dismantling of forms, all signaling and handling shall be done by Carpenters. The setting of templates for anchor bolts for structural members and for machinery, and the placing, leveling, and bracing of these bolts. All framing in connection with the setting of metal columns. The setting of all bulkheads, footing forms, and the setting

17

of, and fabrication of screeds and stakes for concrete and mastic floors where the screed is notched or fitted, or made up of more than one member. The making of forms for concrete blocks, bulkheads, figures, posts, rails, balusters, and ornaments, etc.

The handling of rough materials and dry-wall from the point of erection. The handling of fixtures, display cases, finished lumber, metal, and plastic trim to be erected by Carpenters shall be, handled from the truck or vehicle delivering same to the job by Carpenters.

The building and moving of all scaffolding, runways, and staging where Carpenter tools are used. Erection and dismantling of all metal self-supporting scaffolding, runways, over fourteen (14) feet in height, from its beginning, including the laying of mudsills. The building and construction of all hoists and derricks made of wood. The making of mortar boards, boxes and trestles, all shorting, and razing and moving of buildings.

The cutting and framing of the openings of pipes, conduits, ducts, etc., when they pass through floors, partitions, walls, roofs and fixtures composed in whole or in part of wood. The laying out of, marking, and installation of all inserts and sleeves for pipers, ducts, etc., where Carpenters' tools and knowledge are required. The making and installing of all wooden meter boards, crippling and backing for fixtures. The welding of studs and other fasteners to receive materials being used by Carpenters.

The installation of all grounds, furring or stripping, or ceilings or side walls.

The installations of all exterior or interior trim or finish of wood, aluminum, kalamein, hollow or extruded metal, plastic, doors, transoms, thresholds, and windows. The setting of jambs, bucks, window frames, of wood, metal or other substitute materials of casings, molding chair-rail, wainscoting, china closets, base or mop-board, wardrobes, metal partitions (as per National Decision of Specific Agreement etc.). The complete laying out, fabricating, and erection of stairs. The making and erection of all fixtures, cabinets, shelving, racks, louvers, etc. The morticing and application of all hardware in connection with our work. The assembling and setting of all seats in theaters, halls, churches, schools, grandstands, gyms, auditoriums, and other buildings. (All bowling alley work).

The site manufacture, fabrication, and installation of all screens, storm sash, storm doors, and garage doors. The installation of all weather stripping, inside or outside, blinds, the installation of wood, plastic, or metal awnings, door shelters, jalousies, etc. The laying of wood, wood block, and wood composition in floors.

The installation of all materials used in dry-wall construction, such as: plaster board, all types of asbestos board, transite and other composition board. The application of all material which serves as a base for acoustic tile, except plaster. All acoustical applications (as per National Agreement or Specific Agreement).

The building and dismantling of all barricades.

Installation of rock wool cork, and other installation material used for sound or weather proofing, the removal of, and placing of staff head and brick mold, and all oakum caulking substitutes, etc., and all other caulking in connection with Carpenter work.

18

The installation of all chalk boards.

The operation of all hand winches used to raise wooden structures.

The erection of porcelain panels and siding.

The sharpening of all Carpenter hand or power tools, or those used by Carpenters.

(2) The term "Drapery" shall include the handling, fitting draping, measuring and installation of all hardware and fixtures for same.

The term "shades and blinds" shall include all manner of making, repairing, measuring and installation and hanging of necessary hardware required in the installation.

The term "sink-tops and cabinets", shall include all metal trim and covering for same. All cork, linoleum, congo-wall, linewall, veos tile, plexiglass, vinawall tile, composition tile, plastic tile, aluminum tile, and rubber in sheets or tile form and the application thereof. All bolta-wall and bolta-wall tile and similar products.

**1997-2000 AGREEMENT**
**CONTRACT TO BE EXECUTED BETWEEN AN**
**EMPLOYER WHO IS NOT A MEMBER OF THE**
**SIGNATORY GROUP COVERED BY THIS**
**AGREEMENT**
**and the**
**MICHIGAN REGIONAL COUNCIL OF CARPENTERS**
**TRAVERSE CITY/ALPENA LOCAL 202**

The undersigned Employer has examined the Collective Bargaining Agreement currently in effect between the Michigan Regional Council of Carpenters of the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, hereinafter referred to as the "Union", and the Labor Relations Division of the Michigan Chapter of the Associated General Contractors of America, Inc., hereinafter referred to as the "Association". The Employer hereby accepts and becomes bound as a party to that Agreement in its entirety, which is incorporated by reference as if set forth fully herein, including to those provisions, jointly administered by the Union and Association, and to any amendments to that Agreement adopted by the Association. Further, in performing Carpentry work not covered by the foregoing Agreement, the Employer agrees to adopt and be bound by the terms and conditions contained in the most recent Agreement between the Regional Council in the area where the work is being performed, and Employers who regularly perform work of that nature.

It is also agreed by the undersigned Employer that any notice given by the Union to the Association pursuant to Article XXIV of the foregoing Agreement shall be notice to the Employer and shall have the same force and effect as though it were presented in writing directly to the Employer. Finally, the Employer agrees that, unless he notifies the Union to the contrary by registered mail at least sixty (60), but not more than ninety (90) days, prior to the termination date of the foregoing Agreement, or subsequent Agreements, the Employer will be bound by and adopt any Agreement reached by the Union and the Association during negotiations following the notice by the Union referred to in the preceding sentence.

The Employer further agrees that if it has not previously granted such recognition, it will voluntarily recognize the Union as the sole and exclusive bargaining agent under Section 9 (a) of the National Labor Relations Act for all Employees of the Employer within the bargaining unit covered by the Agreement on all of the Employer's present and future job sites within the Union's jurisdiction, if and when a majority of the Employers' Employees in said bargaining unit authorize the Union to represent them in collective bargaining. The Employer further agrees that any dispute concerning its obligation to recognize the Union as sole and exclusive bargaining agent will be resolved solely under Article XXI, Grievance Procedure.

The Employer expressly waives any right to abrogate or repudiate this Agreement during its effective term, or to seek a National Labor Relations Board election during the term of the Agreement or to condition voluntary recognition on the Union's certification by the National Labor Relations Board following a National Labor Relations Board Election.

20

**1997-2000 AGREEMENT**
**CONTRACT TO BE EXECUTED BETWEEN AN**
**EMPLOYER WHO IS NOT A MEMBER OF THE**
**SIGNATORY GROUP COVERED BY THIS**
**AGREEMENT**
**AND THE**
**MICHIGAN REGIONAL COUNCIL OF CARPENTERS**
**TRAVERSE CITY/ALPENA LOCAL 202**
**(CONTINUED)**

_____
Employer Name

_____
Address

_____
City                              State              Zip Code

_____
Telephone Number

_____
Signature                         Date

_____
Name                              Title

Employer Federal I.D. Number:_____

Workers' Compensation Number: _____

And Carrier:_____

M.E.S.C. Number_____

**MICHIGAN REGIONAL COUNCIL OF CARPENTERS**
**UNITED BROTHERHOOD OF CARPENTERS AND**
**JOINERS OF AMERICA, AFL-CIO**

_____
Signature                         Date

_____
Name                              Title

## MICHIGAN REGIONAL CARPENTERS' COUNCIL
## CONSENT AGREEMENT

The undersigned representing _____

Construction Company, does hereby accept and agree to be bound by all the terms and conditions of the Collective Bargaining Agreement between the Michigan Regional Council of Carpenters, of the United Brotherhood of Carpenters and Joiners of America, and the Employer performing any phase of Carpenter work in the geographical jurisdiction of said Council (said Collective Bargaining Agreements will be hereinafter referred to as Master Agreements) as said Agreements may be modified, amended, or renegotiated from time to time. The Employer also does hereby accept and agree to be bound by all the terms and conditions of the most current Collective Bargaining Agreements of any other Carpenters' Regional Council within the State of Michigan as shall be in effect in any area where the Employer shall engage in any phase of Carpenter work.

This Agreement shall remain in effect from date of signing until the following January 1st, and shall renew itself from year to year thereafter, unless either party shall give notice to the other party in writing not more than ninety (90) days and not less than sixty (60) days prior to January 1st, that it desires to terminate this Agreement.

This Agreement shall not be in effect upon the termination or expiration of the Master Agreements, but shall become effective upon the negotiation of new Master Agreements.

_____
Company Name

_____
Address

_____
City                                      State            Zip Code

_____
Telephone Number

_____
Signature                                 Date

_____
Name                                      Title

_____
Regional Council Representative           Date

_____
Name                                      Title

22

## NOTES

23

# NOTES

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

## MICHIGAN REGIONAL CARPENTERS' COUNCIL
## CONSENT AGREEMENT

The undersigned representing *Tom Bloom Roofing Systems* Construction Company, does hereby accept and agree to be bound by all the terms and conditions of the Collective Bargaining Agreement between the Michigan Regional Council of Carpenters, of the United Brotherhood of Carpenters and Joiners of America, and the Employer performing any phase of Carpenter work in the geographical jurisdiction of said Council (said Collective Bargaining Agreements will be hereinafter referred to as Master Agreements) as said Agreements may be modified, amended, or renegotiated from time to time. The Employer also does hereby accept and agree to be bound by all the terms and conditions of the most current Collective Bargaining Agreements of any other Carpenters' Regional Council within the State of Michigan as shall be in effect in any area where the Employer shall engage in any phase of Carpenter work.

This Agreement shall remain in effect from date of signing until the following January 1st, and shall renew itself from year to year thereafter, unless either party shall give notice to the other party in writing not more than ninety (90) days and not less than sixty (60) days prior to January 1st, that it desires to terminate this Agreement.

This Agreement shall not be in effect upon the termination or expiration of the Master Agreements, but shall become effective upon the negotiation of new Master Agreements.

*Tom Bloom Roofing Systems*
Company Name

*P.O. Box 1810*
Address

*Ann Arbor*          *Mi*          *48106*
City                 State         Zip Code

*313-663-6262*
Telephone Number

*Tom Bloom*                    *3/12/98*
Signature                       Date

*Tom Bloom*          *President*
Name                 Title

*Darrell Maciag*              *3/12/98*
Regional Council Representative   Date

*Darrell L. Maciag*      *Bus. Rep.*
Name                     Title

22

RECEIVED
APR - 6 1998
MICHIGAN REGIONAL COUNCIL OF CARPENTERS

## NOTES

23

| | |
|---|---|
| **From:** | Benjamin Schepis <bschepis@novaratesija.com> |
| **Sent:** | Monday, April 09, 2012 2:38 PM |
| **To:** | Robert Day |
| **Cc:** | Bryan Beckerman; Michael Novara |
| **Subject:** | Bloom Roofing |
| **Attachments:** | Bloom CBA.pdf; Bloom signature.pdf |

Mr. Day:

Pursuant to your request, attached please find the relevant CBA and signature page regarding your client.

Best Regards,

Ben

Benjamin A. Schepis
NOVARA TESIJA, P.L.L.C.
Attorneys and Counselors at Law
2000 Town Center, Suite #2370
Southfield, MI 48075
phone: (248) 354-0380
fax: (248) 354-0393
bschepis@novaratesija.com

This transmission contains CONFIDENTIAL INFORMATION, which may also be LEGALLY PRIVILEGED and which is intended only for the use of the addressee(s) named above. If you are not the intended recipient of this transmission, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this correspondence may be strictly prohibited. If you have received this correspondence in error, please immediately notify us at the telephone or email address shown above, and delete all copies of the original from your computer records. We cannot ensure that this communication is free from harmful viruses or code. Thank you.